UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MIGUEL MUNIZ-MUNOZ,

    Petitioner,

v.                                            Case No. 18-CV-729

JASON BENZEL,

    Respondent.

---

## DECISION AND ORDER ON
## PETITION FOR WRIT OF HABEAS CORPUS

---

Miguel Muniz-Munoz, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket # 1.) Muniz-Munoz was convicted of first-degree intentional homicide and first-degree recklessly endangering safety, both as a party to a crime. (Docket # 1 at 2.) Muniz-Munoz was sentenced to life imprisonment, with eligibility for release in thirty-five years. (*Id.*) Muniz-Munoz alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

This case arises out of an August 3, 2003 shooting at a bar on the south side of Milwaukee in which one person was killed and another injured. (*State of Wisconsin v. Muniz-Munoz*, Appeal No. 2014AP702 (Wis. Ct. App. Mar. 1, 2016) at ¶ 3, Docket # 1-1 at 6–20.) Based on this incident, on June 3, 2004, Muniz-Munoz was charged with first-degree intentional homicide and attempted first-degree intentional homicide, both as party to a crime. (*Id.*) In July, Muniz-Munoz waived his right to a preliminary hearing, various motions

were filed by both sides, and bail was set at $100,000.00. (*Id.*) On December 15, 2004, Muniz-Munoz posted bail. (*Id.*) While he was scheduled to return to court on February 25, 2005, Muniz-Munoz failed to appear. (*Id.*) A bench warrant was issued for his arrest and his bail was forfeited by the trial court. (*Id.*)

Muniz-Munoz was arrested in Mexico and first appeared back in a Milwaukee County court on August 3, 2010. (*Id.* ¶ 4.) New motions were filed by both sides. Muniz-Munoz filed a motion to compel discovery seeking information regarding Muniz-Munoz's capture in Mexico and extradition to the United States. (*Id.*) Muniz-Munoz contended that he was forcibly abducted and tortured while in the custody of the Mexican Federal Police. (*Id.*) The trial court denied Muniz-Munoz's motion. (*Id.*)

Prior to Muniz-Munoz's jury trial, the medical examiner who conducted the autopsy of the victim died. (*Id.* ¶ 5.) A subsequent medical examiner, Dr. Brian Peterson, reviewed the autopsy file and photographs reflecting multiple gunshot injuries, and opined that the victim's cause of death was the result of multiple gunshot wounds. (*Id.* ¶ 24.) Muniz-Munoz sought to exclude Dr. Peterson's opinion on the ground that it violated his rights under the Confrontation Clause because Dr. Peterson did not conduct the autopsy himself. (*Id.*) The trial court ruled that the State could elicit testimony from Dr. Peterson, but only concerning his independent opinions. (*Id.*)

As relevant here, during the jury trial two issues arose. First, twice during the jury trial, concerns were raised regarding whether two jurors were sleeping. (*Id.* ¶ 12.) In each instance, the trial court determined that the jurors were not sleeping and denied the defense's request to either remove the first allegedly sleeping juror, or to *voir dire* both as to whether they heard the evidence. (*Id.*) The trial court explained that he had observed the two jurors and did not

believe that either had actually fallen asleep. (*Id.*) Thus, the trial court denied the request to remove the first juror or to *voir dire* both jurors. (*Id.*)

Second, shortly before the end of the jury trial, Muniz-Munoz proffered a special jury instruction concerning the police department's lack of an electronic recording of Muniz-Munoz's interrogations. (*Id.* ¶ 6.) At the close of testimony, the trial court considered whether Muniz-Munoz's special jury instruction asking the jury to "weigh the evidence of the defendant's statement with great caution and care" should be given. (*Id.*) The trial court declined to give the special instruction. (*Id.*)

In the end, Muniz-Munoz was convicted of first-degree international homicide, as a party to a crime, and to the lesser included charge of first-degree recklessly endangering safety, as a party to a crime. (*Id.* ¶ 11.)

In his direct appeal, Muniz-Munoz raised four grounds for relief. First, he argued that he was denied his constitutional right to a fair trial and impartial jury because of the two sleeping jurors. (*Id.* ¶¶ 13–18.) Second, Muniz-Munoz argued that his right to confrontation was violated when the trial court allowed Dr. Peterson to testify. (*Id.* ¶¶ 19–25.) Third, Muniz-Munoz argued the trial court erroneously exercised its discretion when it declined to give his special jury instruction. (*Id.* ¶¶ 26–29.) And finally, Muniz-Munoz argues the trial court erroneously exercised its discretion in denying his motion seeking discovery of evidence of excessive force used against him when Mexican authorities apprehended him for extradition. (*Id.* ¶¶ 30–35.) The Wisconsin Court of Appeals rejected Muniz-Munoz's arguments and affirmed the judgment of conviction on March 1, 2016. (Docket # 1-1.) The Wisconsin Supreme Court denied Muniz-Munoz's petition for review on April 10, 2017. (Docket # 25-8.)

Muniz-Munoz raised these same four claims in a petition for writ of habeas corpus, filed in this Court, on May 10, 2018. (Docket # 1.) Muniz-Munoz simultaneously filed a motion to stay his habeas petition and hold it in abeyance, stating that he had filed a Wis. Stat. § 974.06 motion in Milwaukee County Circuit Court raising the issues of ineffective assistance of trial and post-conviction counsel. (Docket # 3.) Muniz-Munoz's motion was granted on June 27, 2018. (Docket # 13.) Muniz-Munoz moved to reopen his habeas case on December 13, 2019. (Docket # 24.) While the case was reopened, Muniz-Munoz has not presented or otherwise briefed the ineffective assistance of counsel claims. Thus, I assume he has abandoned those claims and will address the four grounds raised in his original petition. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("We have repeatedly warned that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).'") (internal citation omitted).

## STANDARD OF REVIEW

Muniz-Munoz's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme

Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

5

Case 2:18-cv-00729-NJ   Filed 02/24/21   Page 5 of 17   Document 33

## ANALYSIS

Muniz-Munoz alleges that he is entitled to habeas relief on the following grounds: (1) his constitutional right to a fair trial and impartial jury was violated because of two allegedly sleeping jurors; (2) his right to confrontation was violated by allowing Dr. Peterson to testify; (3) the trial court erroneously exercised its discretion when it declined to give Muniz-Munoz's special jury instruction; and (4) the trial court erroneously exercised its discretion in denying his motion seeking discovery of evidence of excessive force used against him when Mexican authorities apprehended him for extradition. I will address each argument in turn.

   1.   *Right to a Fair Trial and Impartial Jury*

Muniz-Munoz contends that two jurors were sleeping during his trial, depriving him of his constitutional right to a fair trial and impartial jury. As to the first juror, during the trial, the court advised the attorneys that he saw one of the jurors nod his head and close his eyes. (Feb. 15, 2012 AM Jury Trial Transcript ("Feb. 15 AM JT Tr.") at 69–70, Answer, Ex. 22, Docket # 25-22.) The trial court stated that after he "started to see [the juror] nod," the court "watched him carefully[,] trying to get my opportunity to catch him eye-to-eye so I could give him a nonverbal queue that he needed to keep his eyes open." (*Id.* at 69.) The trial court determined that the juror was not actually asleep and did not miss any testimony. (*Id.* at 70.) The court stated that it "believ[ed] [the juror] was closing his eyes and listening without looking which isn't the best of situations[,] but it's not the worst. So I don't believe we're in a situation where we need to release him or repeat any of the testimony." (*Id.*) Defense counsel argued that she saw the juror close his eyes "quite a bit" and asked that he either be removed from the jury, or *voir dired* outside the jury's presence to determine whether he was truly asleep because "he looked like he was sleeping to me." (*Id.* at 71.) The trial court denied this request.

6

As to the second juror, during the afternoon session the same day, defense counsel brought to the trial court's attention another juror who was "nodding off." (Feb. 15, 2012 PM Jury Trial Transcript ("Feb. 15 PM JT Tr.") at 74, Answer, Ex. 23, Docket # 25-23.) Neither the prosecutor nor the court noticed any issues with this second juror. (*Id.* at 75.) While defense counsel also requested the court *voir dire* this second juror, the court denied the request. (*Id.* at 76.)

The Wisconsin Court of Appeals acknowledged that a defendant has the right to an impartial jury pursuant to the Sixth and Fourteenth Amendments, which means a right not to be tried by a juror who cannot comprehend testimony. (Docket # 1-1 at 12, ¶ 14.) The court of appeals found that under Wisconsin law, a sleeping juror falls within the category of a "juror who cannot comprehend the testimony." (*Id.*) The court of appeals noted that whether the constitutional right was violated is reviewed *de novo*; however, it would accept the factual findings of the trial court unless they were clearly erroneous. (*Id.*) The court of appeals considered the trial court's determination that neither juror was sleeping. The trial court based its conclusion on the fact that it "had been diligently monitoring the jury, and although there were some briefly closed eyes, the trial court did not believe either juror was sleeping." (*Id.* at 13, ¶ 18.) The court of appeals determined that the trial court's findings of fact were not clearly erroneous; thus, Muniz-Munoz's constitutional right to an impartial jury was not impaired. (*Id.*)

Muniz-Munoz challenges the court of appeals' finding regarding the allegedly sleeping jurors under § 2254(d)(2), which challenges a state court's determination of facts. (Petitioner's Reply Br. at 1, Docket # 32.) Regarding the court of appeals' factual determinations, under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon

7

Case 2:18-cv-00729-NJ   Filed 02/24/21   Page 7 of 17   Document 33

fact finding that ignores the clear and convincing weight of the evidence. *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010). Factual determinations made by the state court are presumed correct and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Muniz-Munoz argues that the court of appeals' determination is objectively unreasonable in light of the evidence presented and the court of appeals failed to consider key aspects of the record. (Petitioner's Reply Br. at 2.) He argues that the court of appeals determined that the trial court found that neither juror was sleeping, despite the fact the trial court said the first juror was "nodding off" and "snoozing" during the trial, which "constitutes sleeping." (*Id.* at 4.) Muniz-Munoz further argues the court of appeals only considered one of defense counsel's observations regarding the jurors, ignoring the other citations in the record as to counsel's observations. (*Id.*) He argues that four attorneys saw the first juror sleeping; thus, it was incumbent upon the trial court to *voir dire* the juror. (*Id.* at 5.)

      The trial court, unlike the court of appeals, personally observed the jurors in question during trial. As to the first juror, the trial court observed him "nodding," but noted that his eyes were never closed for more than ten seconds at a time. (Feb. 15 AM JT Tr. at 69.) The trial court noted that "until the break, [the juror] never did the other thing we worry about which is the head going and the mouth opening or head and chin dropping which is a sign of a deeper snooze. In fact, that didn't happen until after we took our break, and the instant it happened is when he started to keep his eyes open more frequently." (*Id.*) The trial court further noted that after "we took the break, what I mean by 'break' is the sidebar," defense counsel "eyeballed" the juror, which "helped revive him a little bit" and about four minutes later, the court "caught him eye-to-eye, and from that point forward it wasn't a problem." (*Id.*

8

at 69–70.) The trial court concluded that he did not believe the juror was asleep and missed any testimony; rather, the court concluded that he was closing his eyes and listening. (*Id.* at 70.)

Defense counsel stated that prior to the sidebar, she did not observe the juror because she was too busy thinking about what she was doing. (*Id.*) However, after the sidebar, she did notice the juror and saw him close his eyes "quite a bit." (*Id.*) The trial court questioned defense counsel as to what she meant by the juror closing his eyes "quite a bit," to which counsel responded "I saw him with his eyes closed several times after the break while I was asking questions." (*Id.* at 71.) She stated that "he looked like he was asleep to me, but I'm not in his head. None of us are. We can only say what we see. And we seen his eyes were closed." (*Id.* at 72.) Defense counsel acknowledged, however, that the juror "eventually [ ] did open his eyes up." (*Id.*)

The trial court stated:

> I'll say your observations are not inconsistent with mine. Like I said, for about four minutes after the sidebar, he continued to close his eyes on and off, never more than ten seconds. And I don't believe he was doing anything more than closing his eyes. I think it's fair to say you were concentrating on your cross-examination, so you weren't able, as I was, to watch him constantly for ten to fifteen seconds at a time, which is what I was doing, like I said, in hopes of catching him eyeball to eyeball. And the second I did that, he was perfectly awake for the rest of the time which is another sign that he wasn't that deeply asleep. But I don't even want to suggest he was at all asleep. He wasn't snoozing very much at all to begin with. I don't think at this point that this is a situation I have to be concerned he missed anything. So I'm going to deny the request to voir dire him.

(*Id.* at 72–73.) During the afternoon session that day, the prosecutor also stated that the juror appeared to be "nodding off," that he "had his eyes closed and came back up, much like we were seeing before," and that he "appeared to be sleeping." (Feb. 15 PM JT Tr. at 74.) Again, the trial court stated that while the juror "closed his eyes a few times" again, it was "never

9

more than three seconds." (*Id.*) The trial court found that he never saw the juror "nod or anything else like that" and that he was "not concerned at all about [the juror]." (*Id.* at 75.) Again, during this afternoon session, defense counsel brought to the trial court's attention another juror who was allegedly "nodding off." As to the second juror, neither the trial court nor the prosecutor observed him sleeping and the observation made by one of the defense counsel is unclear because the record was inaudible. (*Id.*) ("The only thing I noticed about [the second juror] at some point before the cross, because I didn't want to interrupt Ms. Vishny, but he was --(Inaudible).")

Muniz-Munoz has not shown that the factual determination that neither juror was asleep during the trial ignores the clear and convincing weight of the evidence. As the court of appeals determined, the trial court diligently monitored the jury and determined, based on his own observations, that neither juror was asleep during the trial. The trial court questioned counsel regarding their observations, and found the observations consistent with the court's, namely, that the juror briefly closed his eyes at times. The trial court determined that given their relative positions in the courtroom, he was better able to observe the allegedly sleeping jurors than counsel. Again, the state court's factual findings are presumed correct. Muniz-Munoz has failed to meet his burden of rebutting the presumption by clear and convincing evidence. Muniz-Munoz is not entitled to habeas relief on this ground.

    2.    *Confrontation Clause*

Muniz-Munoz argues that his rights to confrontation were violated when the trial court allowed Dr. Peterson to testify concerning the victim's cause of death. He argues that the State used the testimonial evidence of the deceased medical examiner against him through the testimony of a surrogate witness (i.e., Dr. Peterson), who neither participated in nor

10

observed the autopsy performed by the previous medical examiner. (Petitioner's Reply Br. at 6.) Muniz-Munoz relies on the Supreme Court cases of *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) in support of his position that the court of appeals unreasonably applied Supreme Court law. (*Id.*) The question before the Supreme Court in *Bullcoming* was whether the "Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact— through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." 564 U.S. at 652. The Court concluded that "surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.*

The next year, the Supreme Court decided *Williams v. Illinois*, 567 U.S. 50 (2012). In *Williams*, a state crime lab sent vaginal swabs taken from a rape victim to Cellmark, a private laboratory, for DNA analysis. At trial, an independent forensic expert, who played no role in the Cellmark analysis, confirmed that "there was a computer match generated of the male DNA profile found in semen from the vaginal swabs of [the victim] to a male DNA profile" produced by the state crime lab from a sample of the defendant's blood. *Id.* at 71–72. A plurality of the Court found no Confrontation Clause problem with this testimony. However, as the Seventh Circuit acknowledged, "the Court's 4–1–4 division left no clear guidance about how exactly an expert must phrase its testimony about the results of testing performed by another analyst in order for the testimony to be admissible." *United States v. Maxwell*, 724 F.3d 724, 727 (7th Cir. 2013).

11

Case 2:18-cv-00729-NJ   Filed 02/24/21   Page 11 of 17   Document 33

The Wisconsin Supreme Court analyzed this line of Supreme Court precedent and concluded that "expert testimony based in part on tests conducted by a non-testifying analyst satisfies a defendant's right of confrontation if the expert witness: (1) reviewed the analyst's tests, and (2) formed an independent opinion to which he testified at trial." *State v. Griep*, 2015 WI 40, ¶ 47, 361 Wis. 2d 657, 687, 863 N.W.2d 567, 582. Similarly, the Seventh Circuit held that "even after *Williams*, we have explained that 'an appropriately credentialed individual may give expert testimony as to the significance of data produced by another analyst.'" *Maxwell*, 724 F.3d at 727 (internal citations omitted). It found that a defendant's Sixth Amendment rights were not violated simply by virtue of an expert relying on another's data in reaching her own conclusions. *Id.*

In Muniz-Munoz's case, the trial court allowed Dr. Peterson to testify regarding his independent opinion of the victim's cause of death. (Docket # 1-1 at 15, ¶ 23.) The court of appeals found that while Dr. Peterson reviewed the autopsy file and the photographs reflecting multiple gunshot wounds, he rendered an independent opinion that the victim died from multiple gunshot wounds. (*Id.* at ¶ 24.) Thus, the court of appeals concluded that Dr. Peterson's testimony did not violate Muniz-Munoz's right to confrontation. (*Id.* at ¶ 25.)

Muniz-Munoz has not shown that the court of appeals' decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Again, as the Seventh Circuit explained, the Supreme Court's plurality opinion in *Williams* "left no clear guidance about how exactly an expert must phrase its testimony about the results of testing performed by another analyst in order for the testimony to be admissible." *Maxwell*, 724 F.3d at 727. And the Seventh Circuit has determined, even after *Williams*, that an expert may rely on another's

12

data in reaching his or her own independent conclusions. *Id.* The Wisconsin Court of Appeals, consistent with the Seventh Circuit's analysis of the law post-*Williams*, concluded that Dr. Peterson's testimony did not violate Muniz-Munoz's right to confrontation because he testified as to his own, independent opinion. This conclusion does not run afoul of clearly established Supreme Court law. Thus, Muniz-Munoz is not entitled to habeas relief on this ground.

### 3. *Failure to Give Special Jury Instruction*

Muniz-Munoz argues that the trial court violated his due process rights by failing to give a jury instruction advising the jury that because his police interview was unrecorded, the jury should weigh his inculpatory statements during that interview "with great caution and care." (Docket # 1-1 at 17–18, ¶ 28.) During the course of a 2004 interrogation, Muniz-Munoz admitted his involvement in the crimes. (*Id.*) None of his statements were recorded. (*Id.*) The trial court gave the standard jury instruction WIS JI—Crim. 180, which states as follows:

> The State has introduced evidence of (a statement) (statements) which it claims (was) (were) made by the defendant. It is for you to determine how much weight, if any, to give to (the) (each) statement.
>
> In evaluating (the) (each) statement, you must determine three things:
>
> • whether the statement was actually made by the defendant. Only so much of a statement as was actually made by a person may be considered as evidence.
> • whether the statement was accurately restated here at trial.
> • whether the statement or any part of it ought to be believed.

The trial court did not, however, give the following instruction from WIS JI—Crim. 180, addressing unrecorded statements:

> ADD THE FOLLOWING IF A STATEMENT RESULTING FROM AN UNRECORDED CUSTODIAL INTERROGATION IS ADMITTED AT A TRIAL FOR A FELONY AND NO EXCEPTION APPLIES

> [It is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony. You may consider the absence of an audio or audio and visual recording of the interrogation in evaluating the evidence relating to the interrogation and the statement in this case.]

The court of appeals determined that the legislative change adding the instruction regarding unrecorded interrogations had not occurred when Muniz-Munoz was interrogated. The court of appeals further found that even if the amended instruction applied, it did not instruct the jury to "weigh the evidence of the defendant's statement with great caution and care." (Docket # 1-1 at 17–18, ¶ 28.) Thus, the court of appeals determined that the trial court properly instructed the jury as to the law concerning Muniz-Munoz's statements to the police. (*Id.* ¶ 29.)

Muniz-Munoz argues that at the time of his 2012 jury trial Wis. Stat. § 972.115 "was in full force and effect." (Petitioner's Reply Br. at 9.) The legislative act amending the statute to add the instruction regarding unrecorded interrogations specifically provides that: "(2) Recording interrogations of adults. The treatment of sections 968.073 and 972.115 of the statutes first applies to custodial interrogations, as defined in section 968.073(1)(a) of the statutes, as created by this act, conducted on January 1, 2007." EVIDENCE—TESTS AND TESTING, 2005-2006 Wisc. Legis. Serv. Act 60, § 51(2) (2005 A.B. 648). Thus, while the statute was in full effect at the time of Muniz-Munoz's trial, it did not apply to Muniz-Munoz's 2004 custodial interrogation. Moreover, as the court of appeals noted, even if it the statute was applicable, it does not require the "great caution and care" instruction which Muniz-Munoz proffered. As such, the court of appeals correctly found that the jury was properly instructed as to the law. In fact, had the trial court given Muniz-Munoz's suggested

instruction, it would have incorrectly instructed the jury as to the applicable law. Muniz-Munoz is not entitled to habeas relief on this ground.

4. *Discovery Issue*

Finally, Muniz-Munoz argues the trial court improperly exercised its discretion in denying his motion seeking discovery of evidence of excessive force used against him when Mexican authorities apprehended him for extradition to the United States. He argues that while in Mexico, he was put in a chokehold and repeatedly punched in the face, causing injury lasting weeks after the assault. (Docket # 1-1 at 18–19, ¶ 30.) Muniz-Munoz argued to the court of appeals that based on the Second Circuit's decision in *United States v. Toscanino*, 500 F.2d 267 (2nd Cir. 1974), if the evidence supported his allegations of torture, it would require dismissal of his case. (*Id.*) The court of appeals adopted the trial court's reasoning in rejecting Muniz-Munoz's argument. The court of appeals held that *Toscanino* is an outlier "which has basically been rejected more recently by other courts." (*Id.* ¶ 33.) Further, the court of appeals relied on the Seventh Circuit's observation that "[f]or the past 100 years, the Supreme Court has consistently held that the manner in which a defendant is brought to trial does not affect the ability of the government to try him." (*Id.* ¶ 34 (quoting *Matta-Ballesteros v. Henman*, 896 F.2d 255, 260 (7th Cir. 1990).) Thus, the Wisconsin Court of Appeals concluded that even if the allegations of torture were true, any discovery request would have been futile because it would not have resulted in dismissal of the charges. (*Id.* ¶ 35.) Muniz-Munoz points to no clearly established Supreme Court law holding contrary to the court of appeals' decision. Without clearly established Supreme Court law, the court of appeals cannot have acted contrary to it. *See Woods v. Donald*, 575 U.S. 312, 317 (2015) ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be

'contrary to' any holding from this Court."). Muniz-Munoz is not entitled to habeas relief as to this claim.

## CONCLUSION

Muniz-Munoz alleges that he is entitled to habeas relief due to alleged violations of his right to a fair trial and impartial duty, his due process rights, and his Confrontation Clause rights. I find that none of these grounds entitle Muniz-Munoz to habeas relief. Thus, Muniz-Munoz's petition for a writ of habeas corpus is denied.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4).

Jurists of reason would not find it debatable that Muniz-Munoz is not entitled to habeas relief. Thus, I will deny Muniz-Munoz a certificate of appealability. Of course, Muniz-Munoz retains the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of February, 2021.

BY THE COURT:

*Nancy Joseph*
_____
NANCY JOSEPH
United States Magistrate Judge